**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>EX REL.</u> [UNDER SEAL]<br><br>                     Plaintiffs,<br><br>        v.<br><br>[UNDER SEAL]<br><br>                  Defendants. | Civil Action No:  1:17-cv-285<br>                     Judge Dlott<br><br>**COMPLAINT** |

**FILED IN CAMERA AND UNDER SEAL**

**DO NOT ENTER IN PACER**

1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

UNITED STATES OF AMERICA, <u>EX REL.</u> ROBERT COLE, KRISTIE KING, and DAVID OLSON,

Plaintiffs,

v.

SALLYPORT GLOBAL HOLDINGS, INC., and MICHAEL BAKER INTERNATIONAL, LLP,

Defendants.

Civil Action No: 1:17-cv-285

Judge Dlott

**COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729 <u>ET SEQ.</u>**

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER IN PACER**

## <u>COMPLAINT</u>

## I.    <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made or caused to be made by Defendants Sallyport Global Holdings, Inc. ("Sallyport"), and Michael Baker International, LLP ("Michael Baker"), to the United States in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA" or "Act").  At issue are false claims for payment and false statements submitted by Sallyport and Michael Baker (collectively, "the Defendants") to the United States Air Force, and false statements made to the Defense Contract Auditing Agency ("DCAA") to get false claims paid, pursuant to the Defendants' contract for the provision of life support, logistical support, and security services at Balad Air Base ("Balad") in Iraq.

2.      The FCA prohibits the submission of false or fraudulent claims for payment to the United States, as well as the making of false statements for the purpose of causing a false

claim to be paid. The FCA provides that any person who knowingly submits, or causes to be submitted, false or fraudulent claims to the government for payment or approval is liable for a civil penalty of up to $21,916 for each claim, plus three times the amount of damages sustained by the government. The Act empowers persons with information regarding false or fraudulent claims made to the government, "relators," to bring an action on behalf of the United States and to share in any recovery. The complaint must be filed under seal for 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the action.

3.    Pursuant to the Act, Relators Robert Cole, Kristie King, and David Olson (collectively, "Relators") seek to recover on behalf of the United States damages and civil penalties arising from false and improper claims for payment that the Defendants submitted, or caused to be submitted, to the U.S. Air Force and the DCAA, in connection with their contract to provide logistical support, security, and life support for U.S. personnel and Iraqi Air Force troops at Balad.

4.    The Defendants engaged in fraudulent conduct that violated the FCA in several ways, including:

a.    Engaging in widespread timesheet fraud by (1) billing the government for labor that was not performed; (2) cross-charging work performed on the Defendants' private, Baghdad-based contracts to the government; and (3) inflating labor rates reimbursed by the government by miscategorizing the work performed at Balad;

      b.    Diverting millions of dollars of federal Foreign Military Sales ("FMS") funds from their legitimate government purposes to serve the Defendants' own private business interests in Iraq;

      c.    Using these FMS funds to pay bribes and kickbacks to Iraqi officials in violation of the Foreign Corrupt Practices Act ("FCPA") and the express terms of their contract with the U.S. Air Force;

      d.    Falsifying forms and documents to effectuate and conceal both the timesheet fraud and the waste of FMS funds;

      e.    Repeatedly interfering with Relators' efforts to investigate these fraudulent schemes pursuant to their investigative duties at Balad;

      f.    Repeatedly concealing these failures and falsifications in audits, inspections, and claims for payment; and

      g.    Discharging Relators in retaliation for investigating and reporting these fraudulent schemes.

5.      Through this course of fraud, the Defendants have falsely billed the government for millions of dollars of work that did not occur, did not support the Balad Air Base, or was charged at inflated and mischaracterized labor rates.  In addition, the Defendants have fraudulently billed the government for services and materials—again, totaling in the millions of dollars—that the Defendants knew to be outside the scope of their contract with the U.S. Air Force to serve their own private business interests in Iraq.

## II.    __PARTIES__

6.      Relator Robert L. Cole began working for Sallyport at Balad Air Base in May

2014.  Along with the other U.S. contractors stationed at Balad, Mr. Cole was forced to evacuate

Balad in July 2014 due to military advances made by the Islamic State in Iraq.  He returned to

Balad on May 9, 2015, as a Security Investigator and was promoted to Lead Security

Investigator in December 2016.  In these roles, Mr. Cole was responsible for investigating crimes

and other misconduct on the base.  Mr. Cole was hired for this position based on his over thirty

years of experience with investigative work.  Prior to joining the Balad project, he had worked as

a police officer in the San Francisco area for over 25 years, as a licensed private investigator in

California, and as an investigator for the United Nations in Haiti.  Through his investigations at

Balad, Mr. Cole discovered many of the fraudulent schemes and false statements detailed in this

Complaint.  On March 12, 2017, the Defendants terminated Mr. Cole in retaliation for his

investigation into the fraud schemes at Balad.  He currently resides in Richland, Georgia.

7.      Relator Kristie King began working at Balad Air Base in June 2014 in the

Hospital Aseptic Management Services ("HAMS") division.  Shortly after arriving at Balad, she

too had to evacuate due to the Islamic State's advances in Iraq.  She returned to Balad on May 9,

2015.  In January 2016, she was promoted to Security Investigator to assist Mr. Cole with the

overwhelming number of incidents on the base requiring investigation.  Like Mr. Cole, Ms. King

brought years of investigative experience to the position, having worked as both a sheriff deputy

and a police sergeant in Texas prior to joining the Balad project.  Based on investigations she

conducted with Mr. Cole, Ms. King has personal knowledge of much of the fraudulent conduct

detailed in this Complaint.  On March 12, 2017, the Defendants terminated Ms. King in

retaliation for her investigation into the fraudulent schemes at Balad.  She currently resides in

Amarillo, Texas.

5

8.      Relator David Olson worked as a Finance and Accounting Manager at Balad. Sallyport hired Mr. Olson for this position on July 4, 2016.  After a brief training in the United States, Mr. Olson deployed to Iraq on July 22, 2016.  At the time he was hired, Mr. Olson had worked in financial operations for over 20 years, including over a decade of work related to government contracting.  At Balad, his responsibilities included approving expenditures and investigating allegations of financial waste and abuse.  During his time at Balad, Mr. Olson observed numerous improper financial practices conducted by the Defendants, which he reported to his supervisors and the Defendants' senior management.  On January 5, 2017, the Defendants terminated Mr. Olson in retaliation for his investigations into fraudulent schemes at Balad.  He currently resides in Vienna, Virginia.

9.      Defendant Sallyport Global Holdings, Inc., is a global security and mission-support-services company incorporated under Delaware law with corporate headquarters at 11921 Freedom Drive, Reston, Virginia.  It is the parent company of Sallyport Global Services, a Bermuda entity wholly owned by Sallyport Global Holdings.  Sallyport was founded in 2003 to secure contracts related to the post-war reconstruction efforts in Iraq.  Today, it offers a wide range of services to its private and governmental clients, including life and logistics support, base operations and maintenance, security and risk management, and construction.  Sallyport currently operates as a division of Michael Baker, according to Michael Baker's website.

10.      Defendant Michael Baker International is a global engineering, development, intelligence, and technology company incorporated in Pennsylvania with its corporate headquarters at 500 Grant Street, Pittsburgh, Pennsylvania.  In addition to funding Sallyport's operations at Balad, Michael Baker has significantly promoted the Balad project in press releases

6

and on its website as an example of its global capabilities.

## III. JURISDICTION AND VENUE

11.     This is an action brought pursuant to the False Claims Act, 31 U.S.C. § 3279 *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.     This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants can be found in and transact the business that is the subject matter of this lawsuit in the Southern District of Ohio.

13.     Venue is proper in the United States District Court for the Southern District of Ohio, pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), because the Defendants transact business in this district and many of the acts that form the basis of this Complaint occurred in this district.

## IV. BACKGROUND

### A.     The Balad Air Base Contracts

14.     Balad Air Base is located along the Tigris River approximately fifty miles north of Baghdad, Iraq.  Originally built by the Iraqi military, Balad Air Base was captured by U.S. forces in April 2003 as part of the Iraq War.  Throughout the war, Balad served as a pivotal logistical hub for the U.S. military.  At its peak, the base housed about 36,000 U.S. troops and civilian contractors.

15.    In November 2011, control of Balad was transferred back to the Government of Iraq.  Shortly thereafter, the base went into a "cold" operational state and many of the facilities on the base were reduced or removed.

16.    In 2011, Iraq purchased eighteen F-16 fighter jets from the United States under the U.S. Foreign Military Sales Program ("FMS").  Iraq later ordered another eighteen F-16s, bringing the total order to thirty-six airplanes.  The Iraqi Air Force decided to station these F-16s, as they become available, at Balad Air Base.  As a result, the Iraqi Air Force needed to establish and maintain facilities at Balad that could support this new fleet of aircraft.  To do so, the U.S. Air Force entered into a series of contracts with Sallyport and its parent company, Michael Baker International, LLC, from 2014 to 2017.

17.    In February 2014, Michael Baker was awarded multiple contracts by the U.S. Air Force, totaling $838 million over a three-year period, to establish and maintain an operational status at Balad that could support the new F-16 aircraft.  Through its wholly owned subsidiaries, Michael Baker agreed to provide the engineering, construction, and logistical services needed for the F-16s' deployment at Balad.  In addition to the design and construction of several new facilities at the base, the contract required Michael Baker to provide nearly every service required at Balad, from flight tower operations to recreational opportunities.

18.    The U.S. Department of Defense ("DOD") announced the first Balad contract, Contract FA8615-14-C-6020 (the "BBS Contract"), on February 4, 2014.  KS International, another wholly owned subsidiary of Michael Baker, received this $623,300,000 contract to provide "base operating support, base life support, and security services at Balad Air Base"

through January 2017. The BBS Contract was awarded as a sole-source acquisition, meaning the U.S. Air Force did not engage in a competitive bidding process before awarding the contract.

19.     On February 12, 2014, DOD announced that Sallyport Global Services had been awarded Contract FA8615-14-C-6021 (the "Construction Contract") for the renovation and reconstruction of key facilities at Balad. This $215,000,000 contract was also awarded as the result of a sole-source acquisition. The construction work was to be completed by June 2015.

20.     Both contracts were Foreign Military Sales ("FMS") for the Government of Iraq. The FMS program under the Arms Export Control Act, 22 U.S.C. § 2751 *et seq.*, authorizes the United States to sell defense articles and services to foreign governments to promote U.S. security. The Air Force Life Cycle Management Center/WWMK at Wright-Patterson Air Force Base in Ohio served as the contract administrator for both agreements.

21.     On January 29, 2016, DOD announced that it had exercised a one-year, $271,813,941 option to extend the BBS Contract. The contract extension was awarded to Sallyport Global Holdings, Inc.

22.     On January 27, 2017, DOD announced that Sallyport Global Holdings, Inc., had been awarded a $200,000,000 modification of the BBS Contract, extending the agreement through July 31, 2017, and bringing the total value of the Balad contracts to over one billion dollars.

**B.     Regulatory Oversight of the BBS Contract**

23.     As an FMS contract, the BBS Contract was subject to the Federal Acquisition Regulation ("FAR"). *See* 48 C.F.R. § 225.7301(b). In addition, by its express terms, the Performance Work Statement ("PWS") within the BBS Contract required the Defendants to

comply with a wide range of terms, provisions, and representations set out in the industry standards, Air Force regulations and programs, and other sources cited in the PWS.

24.     Both the BBS Contract and the Construction Contract were initiated as undefinitized contract actions.  An "undefinitized contract action" means that the contractual terms, specifications, or price is not agreed upon before performance begins.  10 U.S.C. § 2326(i)(1); 48 C.F.R. § 217.7401(d).  Definitization means "the agreement on, or determination of, contract terms, specifications, and price, which converts the undefinitized contract action to a definitive contract."  48 C.F.R. § 217.7401(b).

25.     Although the BBS Contract was announced as a "firm-fixed price" agreement, the "price" announced at the time—$623,300,000—represented only the price ceilings for the undefinitized contract action, rather than a predetermined fixed price.  Such price ceilings are required for most undefinitized contract actions.  *See id.* § 217.7404-2.  In practice, the BBS Contract operated as cost-plus-fixed-fee agreement, whereby the government reimbursed the Defendants for their direct and indirect costs and then awarded them a profit fee based on their performance.  Thus, the final price for the BBS Contract was not set until definitization and was dependent upon the costs incurred by the Defendants during performance, subject only to a not-to-exceed cap.  This made the BBS Contract, in practice, a cost-reimbursable contract.

26.     "Direct costs" are those directly attributable to a specific "cost objective."  *Id.* § 2.101.  A "cost objective" means a specific "function, organizational subdivision, contract or other work unit."  *Id.* § 31.001.  Direct costs may include the salaries of laborers working on a project covered by a specific contract and the cost of materials needed for that project.  "Indirect costs" are those not directly attributable to a specific cost objective because they are incurred in

10

support of two or more cost objectives, or in support of the operation of the business as a whole.
*Id.* § 2.101.

27.     Contractors may only charge "allowable" costs to the Government.  A cost is
allowable if it is reasonable, allocable, and compliant with professional accounting standards, the
terms of the relevant government contract(s), and the limitations in Subpart 31.2 of the FAR. *Id.*
§§ 31.201-2(a); 52.216-7.  A cost is allocable to a government contract if it: (a) "[i]s incurred
specifically for the contract" (i.e., a direct cost), or (b) "[b]enefits both the contract and other
work, and can be distributed to them in reasonable proportion to the benefits received," or "[i]s
necessary to the overall operation of the business" (i.e., an indirect cost).  *Id.* § 31.201-4.

28.     Most undefinitized contract actions include a definitization schedule that requires
the contractor to submit a "qualifying proposal" for the final contract terms, specifications, and
price.  See *id.* §§ 217.7406(b), 252.217-7027.  The qualifying proposal must include certified
cost and pricing data to support the proposed terms and price.  *See id.* § 252.217-7027.  Cost or
pricing data is all information that would reasonably be expected to have an effect on the price
paid by the Government.  *See* 10 U.S.C. § 2306a.  Definitization must then occur by the earlier
of (1) 180 days after the contractor submits a qualifying proposal or (2) the date on which the
funds obligated under the contract action exceed fifty percent of the price ceiling.  *See* 10 U.S.C.
§ 2326(b)(1); 48 C.F.R. § 217.7404-3.

29.     On the BBS Contract, definitization took place following each period of
performance.  These periods concluded in late January, and the definitization process typically
lasted approximately 6 months, concluding in July.  Both the U.S. Air Force and the DCAA
participated in the definitization process.

30.     Under section 2.5.2 of the BBS Contract PWS, the Defendants were required to "maintain proper and accurate timekeeping records of personnel assigned to work on the requirements of this PWS." These timesheets provided the basis for determining the direct labor costs reimbursed by the government. To avoid unnecessary expenditures, section 2.7 of the PWS required the Defendants to "match personnel skills to the work or task with a minimum of under/over employment of resources."

31.     Section 1.4 of the PWS made clear that the Defendants "shall be expected to comply with all Iraqi laws and regulations" during the performance of the contract. If compliance with Iraqi law would jeopardize the successful completion of the BBS Contract, the Defendants were required to notify the assigned Contracting Officer Representative and the designated Air Force Life Cycle Management Center/WFI contracting officer at Wright-Patterson Air Force Base.

32.     Section 1.4 of the PWS also required the Defendants to comply with all applicable U.S. law and regulations. The Contract thus explicitly incorporates U.S. law governing business enterprises operating abroad, including the Foreign Corrupt Practices Act. Broadly speaking, the FCPA prohibits any "domestic concern" from giving, or offering to give, anything of value to any foreign official for purposes of "(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage . . . in order to assist such domestic concern in obtaining or retaining business." *See* 15 U.S.C. § 78dd-2(a). "Domestic concern" means, in part, "any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its

12

principal place of business in the United States, or which is organized under the laws of a State

of the United States." *See id.* § 78dd-2(h)(1)(B). This provision applies with equal force to the

employees, agents, officers, and directors of a domestic concern. *Id.* § 78dd-2(a). The

Defendants each qualify as a "domestic concern."

33. Moreover, section 2.6 of the PWS made the Defendants responsible for all

subcontractor work under the BBS Contract and required them to ensure that "no Organizational

Conflict of Interest (OCI) considerations" were created by their subcontractor arrangements.

34. Finally, under section 3.4.16 of the PWS, entitled "Security Investigation

Support," the Defendants had to "accurately record and document all incidents to include

evidence associate[d] with an incident (physical, photographical, chemical, biological, etc.),

maintain such documents and evidence, and allow authorized personnel access to all information

while conducting the investigation."

## V. GENERAL ALLEGATIONS

35. In May 2015, the Defendants hired Mr. Cole to perform the Security Investigator

duties called for by the PWS. In this role, he was responsible for investigating all forms of

wrongdoing at Balad, such as theft, violence, smuggling, and drug use. Due to the large number

of incidents requiring investigation, Mr. Cole requested additional support from his superiors in

late 2015. As a result, Ms. King was made a Security Investigator in January 2016. In addition,

an Iraqi national, Muhammad ("Scott") Moza, assisted their investigations. Collectively, they

comprised the entire Investigations Unit at Balad.

36. Mr. Cole and Ms. King reported to several different supervisors during their

tenure at Balad. Initially, the Air Base Project Manager at Balad, David Fielder, managed their

work.  Later, the Security Director at Balad, Steve Asher, assumed oversight of their investigations.  After approximately one year reporting to the Security Director, they resumed reporting to the Air Base Project Manager, then Kim Poole.  When Mr. Poole left Balad, they continued to report to the new Air Base Project Manager, David Saffold.  In addition, their work was supervised by the corporate-level Program Manager, Roy Hernandez, who worked at Sallyport's Reston, Virginia, headquarters.

37.     Mr. Cole and Ms. King's investigations originated from a variety of sources. Often, they received cases from their supervisors—either the Program Manager or the Security Director—or a department manager on the base who had uncovered wrongdoing.  Other times, they received anonymous tips regarding wrongdoing.

38.     To track their work, Mr. Cole and Ms. King developed a "call for service" system based on their experience as police officers.  Whenever they undertook an investigative task, they documented it in a handwritten "call for service" book.  Each call for service was given a distinct identification number.  If the matter escalated to a full investigation, they would assign a case number to the matter.  They also maintained an electronic "case tracker" that they used to document their more significant investigations.

39.     Separately, the Defendants hired Mr. Olson in July 2016 to help bring transparency to the financial practices at Balad.  For most of his tenure, he reported directly to the Sallyport finance department in its Reston headquarters, which included Vice President of Finance Scott Perkins and Chief Financial Officer John Velano.

40.     Over the course of their tenures at Balad, Relators collectively discovered the series of frauds and abuses set out in this Complaint.  In total, these fraudulent schemes have led

14

the U.S. government to make over one hundred million dollars in improper payments to the Defendants.

**A.    The Defendants engaged in rampant timesheet fraud on the Balad BBS Contract.**

41.    Starting in early 2016, Mr. Cole and Ms. King undertook a series of investigations into timesheet fraud and other financial wrongdoing under the BBS Contract.  As described below, Mr. Cole and Ms. King discovered new instances of fraud at virtually every turn of their inquiry.  Mr. Olson also became aware of timesheet frauds over the course of his employment.  Ultimately, Relators discovered that timesheet abuse was endemic at Balad and that senior Sallyport employees were complicit in or willfully ignorant of the fraud that Relators had uncovered.  This timesheet fraud manifested itself in several different forms, discussed in more detail below.  These examples demonstrate that timesheet fraud permeated every aspect of the Defendants' performance of the Balad contracts.

**1.    The Defendants billed the government for labor that was not performed or not eligible for reimbursement.**

**a.   Prostitution, Drug & Alcohol Abuse**

42.    On or around February 16, 2016, Air Base Project Manager Kim Poole instructed Mr. Cole and Ms. King to investigate a report of drug and alcohol smuggling at Balad's Passenger Access ("PAX") Terminal, the base's civilian transportation hub.  They initiated their investigation and quickly confirmed the existence of the smuggling.  Mr. Cole and Ms. King were alarmed that the illicit materials had made it past Balad's secure perimeter.  They traced the smuggling to Al-Burhan Hotel, a secure hotel located within the Baghdad International Airport

compound, and also discovered that Sallyport employees had visited prostitutes at the Al-Burhan

Hotel.  Ms. King and Mr. Moza were immediately dispatched to Al-Burhan to conduct

interviews, while Mr. Cole remained at Balad to investigate at the PAX Terminal.  Later, they

discovered that the Defendants had hired approximately four of the women working as

prostitutes at Al-Burhan to work as full-time custodial employees at Balad.  As a consequence,

the government was charged for the services of prostitutes.

43.     After just four days, however, Mr. Cole and Ms. King's investigation into the

PAX Terminal was shut down by Sallyport management.  On or around February 20, 2016, Mr.

Poole sent an email to Mr. Cole instructing him to halt the investigation.  As a result, Ms. King

and Mr. Moza were immediately recalled from Al-Burhan and Mr. Cole's inquiries at the

terminal ceased.  The decision to shut down their work was a clear violation of the PWS's

requirement that the Defendants "allow authorized personnel access to all information while

conducting [an] investigation."

44.     Mr. Cole and Ms. King decided that they still needed to debrief Mr. Poole and

document their efforts in an Incident Report.  On or around February 21, 2016, the three-person

investigation team met with Mr. Poole to discuss their investigation and provide Mr. Poole with

a summary of their findings.  At the meeting, Mr. Poole explained that Mr. Hernandez had

specifically instructed him to shut down the investigation.  Mr. Poole stated that the investigation

could not go forward because the Defendants had no clear policy regarding alcohol at Balad.

Mr. Cole and Ms. King found this explanation wanting, as the Defendants maintained a policy

prohibiting the consumption of intoxicating substances and the Iraqis prohibited all alcohol on

the base.  Moreover, this purported basis for terminating their investigation did not address the

16

drug-smuggling, security, and prostitution issues that they had uncovered.  Despite these concerns, Mr. Poole nevertheless insisted that they drop the investigation.  As a result, the government was improperly charged for services that were not reimbursable.

### b.  Timesheet Fraud – Maintenance Yard

45.     Even though the smuggling investigation ended prematurely, the team's increased presence at the PAX Terminal generated a number of tips from the terminal's employees.  One of these tips, submitted as an anonymous Facebook message to Ms. King, indicated that there was a significant amount of timesheet fraud occurring at the PAX Terminal. The investigators also mentioned this tip to Mr. Poole during their meeting on or around February 21, 2016.

46.     In or around April 2016, Mr. Cole and Ms. King were instructed to investigate a separate timesheet fraud at Balad.  The Manager of Balad's Vehicle Maintenance Yard, Monte Rice, had discovered that two Iraqi Sallyport employees had manipulated their timesheet cards to show that they had worked on days when they were not even present on the base.  Mr. Saffold, who by then had replaced Mr. Poole as the Air Base Project Manager, instructed Mr. Cole and Ms. King to investigate Mr. Rice's accusations.

47.     Mr. Moza was the first member of the investigation team to question the accused employees.  Both employees admitted to Mr. Moza that they had entered the shared computer drive containing their timesheets and edited the documents to misrepresent the total number of days they had worked.  Although they later denied this conduct to Mr. Cole in a subsequent interview, Mr. Cole discovered an electronic record demonstrating that they had altered the timesheets after they had been submitted.

17

48.     Mr. Cole and Ms. King documented these findings in a written Incident Report that they submitted to Mr. Saffold, and the implicated employees were subsequently terminated. The Defendants did not, however, report the fraudulent overcharges to the government or provide any credit to the BBS Contract.  Instead, the government only learned of the fraud when, over four months later, the onsite Contracting Officer Representative, Robert McCloud, noticed a "timesheet fraud" entry on the team's "case tracker" document and inquired about the investigation.  After Mr. Cole and Ms. King explained what they had found to Mr. McCloud, he confronted the Defendants about their failure to notify the government.  Ultimately, the Defendants agreed to reimburse the government for the false billings.

49.     Following the Maintenance Yard investigation, Mr. Saffold instructed Mr. Cole and Ms. King to confer with him before initiating any significant investigations, even though their Standard Operating Procedures, which Mr. Saffold had previously approved, did not require them to do so.

### c.   Timesheet Fraud – PAX Terminal/AOTC

50.     On or around July 7, 2016, Mr. Cole and Ms. King received a new report of timesheet fraud at the PAX Terminal.  Once again, this tip came from an anonymous Facebook message to Ms. King, followed by a call to her cell phone.  The tipster alleged that an Iraqi Sallyport employee had been paid for days that he had not worked and that an American Sallyport employee had knowingly approved the Iraqi employee's false timesheets in exchange for gifts.

51.     Mr. Cole and Ms. King immediately informed Mr. Saffold of the anonymous tip. Mr. Saffold instructed them to investigate the potential timesheet fraud but limited the scope of

18

their inquiry to the approximately 20 employees in the Air Traffic Operations Center ("ATOC")

Cargo division within the PAX Terminal. In addition, he instructed them only to review

employee timecards from 2016, even though there was no indication that the fraud was limited to

that year. Once again, this curtailing of their investigation violated the PWS's requirement that

the investigators have "access to all information while conducting [an] investigation."

52.     Mr. Cole and Ms. King launched their investigation within this narrowed scope,

interviewing ATOC-Cargo employees and reviewing their timesheets. They quickly learned that

the division had no formal timesheet system for its Iraqi employees, known as "local nationals."

Instead, the Defendants relied on attendance sheets for a daily "Tool Time" meeting, where

supervisors discussed safety-related issues for approximately one hour, as a proxy for

determining which local national employees had worked that day. Moreover, under the

employment contracts typically drafted by Sallyport's Human Resources Manager for Iraq,

Misty Stone, local nationals were sometimes paid on daily basis. Thus, employees who were

listed on the Tool Time attendance sheet were routinely paid for a full day's work.

53.     As part of the investigation, Ms. King reviewed all of the Tool Time attendance

sheets for 2016 and compared them to the employee's timesheets. She found that numerous

employees had been paid for days when their signature did not appear on the attendance sheet,

meaning there was no documentation of the employee's attendance to support the payment. She

also discovered numerous examples where an employee's signature was clearly forged. Ms.

King estimated that, over just seven months, the approximately 20 employees at issue had been

paid at least $13,000 for work that was not performed.

54. Given the repeated and widespread nature of these overpayments within the division, Mr. Cole and Ms. King suspected that the employees and their supervisors were deliberately billing the government for labor that was not performed. Their suspicions were confirmed when an Iraqi employee confessed that he had been routinely paid for days when he had not even reported to the base and that an American employee had knowingly approved his fraudulent timesheet.

55. Following their investigation, the investigation team prepared a written Incident Report describing their findings. On or around August 25, 2016, they delivered this report to Mr. Saffold, along with their entire case file, during a meeting in his office. At this meeting, Ms. King explained that her $13,000 estimate likely understated the total amount of overpayments made by the government to ATOC-Cargo employees, as it included only those with missing or clearly forged signatures on the Tool Time attendance sheet, and did not include any adjustment to reflect employees who may only have worked a partial day. Moreover, they informed Mr. Saffold that they suspected the fraud extended beyond the ATOC-Cargo division and likely dated back to the beginning of the Balad BBS project in 2014. Indeed, they believed that some departments had no records—not even attendance sheets—to support the labor hours that they billed to the government. When the Investigations Unit team asked to broaden their inquiry to address these concerns, Mr. Saffold denied their request and asked whether they expected him to "fire everybody" at the PAX terminal.

56. Shortly after this meeting, Mr. Saffold instructed Mr. Olson, who had recently begun his employment as a Finance and Accounting Manager, to "independently investigate" the allegations of timesheet fraud in the ATOC-Cargo division. At the time, Mr. Olson was in the

20

process of developing an adequate timekeeping system for the Defendants' Iraqi employees. Mr. Saffold gave Mr. Olson just 48 hours to report back. When Mr. Olson asked to review the extensive case file that Mr. Cole and Ms. King had assembled over the course of several weeks, Mr. Saffold denied his request. He also instructed Mr. Olson not to discuss the matter with Mr. Cole or Ms. King.

57. Per Mr. Saffold's instructions, Mr. Olson immediately discussed the timesheet-fraud allegations with the Director of Air Services, Walter Manwill. Mr. Manwill explained that the ATOC-Cargo division had no formal timesheet records and instead relied solely on the Tool Time attendance sheets. Mr. Olson concluded that these attendance sheets, which only documented an employee's whereabouts for approximately one hour, were not an appropriate measure of time and attendance. This conclusion troubled Mr. Olson because the Defendants had repeatedly represented in billing submissions to the government that they did, in fact, maintain adequate time and attendance records.

58. After his conversation with Mr. Manwill, Mr. Olson prepared a two-page email to Mr. Saffold explaining that because the ATOC-Cargo division relied only on the attendance sheets, there were no sufficient time and attendance records on which to base an investigation. Upon receiving this email, Mr. Saffold called Mr. Olson and told him to consolidate his report into four simplified bullet points. Mr. Olson revised his email accordingly. Mr. Saffold then removed two bullet points and forwarded the remaining summary to Mr. Hernandez in Reston. Mr. Saffold told Mr. Hernandez that he did not recommend going forward with any disciplinary action against the ATOC employees.

21

59.     Mr. Olson subsequently spoke with Mr. Cole and Ms. King regarding their more extensive investigation into the ATOC-Cargo division.  After hearing their findings, Mr. Olson explained that he would not have reached the same conclusions in his earlier review if he had been given the opportunity to collaborate with them and examine their case file, which included approximately 400 pages of findings and evidence.

### d.  Timesheet Fraud and other Corruption – HRLN

60.     In or around early January 2017, Gene Potes, the Deputy Security Program Manager at Balad, informed Mr. Cole and Ms. King that he suspected there was significant timesheet fraud occurring within the Human Resources Local National ("HRLN") cell at Balad. Per their standard Operating Procedures, Mr. Cole and Ms. King immediately completed a call for service on the tip.  Later, Mr. Cole and Ms. King discovered that Mr. Potes had also reported his concerns to Mr. Saffold, who in turn directed the issue to Ms. Stone, then the Human Resources Manager at Sallyport's Reston headquarters.  When Ms. Stone asked Michael Greer, the acting Human Resources Manager at Balad, to investigate the matter, he refused, explaining that he was not an investigator and thus lacked the skills necessary to conduct a sufficient inquiry.

61.     At the same time, Mr. Olson was independently aware of issues within the HRLN cell.  Almost immediately after he was brought onto the Balad project, Mr. Olson discovered that the Defendants had no formal timesheet system for their local national employees, even though these employees comprised up to 1,700 of their approximately 3,000 employees at Balad.  To address this problem, Mr. Olson was instructed to devise and implement a new timekeeping system for the local nationals by converting daily attendance records, such as the Tool Time

sign-in sheets described above, into a formal timekeeping mechanism. His efforts were hampered by the disorganization within the HRLN cell. Under Ms. Stone's leadership, the employment contracts issued to local nationals by the Defendants' Human Resources department consistently varied in meaningful ways, making it difficult to establish uniform protocols and monitor the local nationals' compliance with their contractual obligations. When Mr. Olson requested to have a representative sample of these contracts translated into English by an independent third party, his supervisors denied his request.

62. In addition, Mr. Olson learned that the HRLN cell was engaged in significant corruption due to inadequate oversight by the Defendants. The leaders of the HRLN cell controlled virtually all hiring and firing of local nationals. Local nationals at Balad complained to Mr. Olson that they had to make payoffs to the HRLN cell in order to get hired. He heard reports of HRLN employees receiving automobiles, fuel, or up to $500 in cash from local nationals looking to secure employment at Balad. Similarly, managers at Balad complained to Mr. Olson that the hiring of local nationals was not competitive and that they could not always hire their desired candidates because of the HRLN cell's control over the process.

63. Mr. Olson raised these issues with his supervisors, including Mr. Saffold and Mr. Perkins, and indicated that he would like to begin auditing the HRLN cell's employment contracts, irregular hiring practices, and potential payoffs. Mr. Saffold told Mr. Olson that he was aware of the abusive practices and that steps were being taken to address them. To Mr. Olson's knowledge, nothing was ever done to address the issue. Mr. Perkins informed Mr. Olson that the HRLN issues fell under Ms. Stone's purview as Human Resources Manager and that he should not push this or any other issue involving Ms. Stone, Velox, or the leadership at

the Mansour compound, given the "political" circumstances at Sallyport's corporate headquarters in Reston.

64.     As discussed below, all three Relators were ultimately terminated in retaliation for their investigation into the issues surrounding the HRLN cell's misconduct.

## 2.     The Defendants cross charged labor performed for its unrelated private contracts in Iraq to the BBS Contract.

65.     Under FAR, the Defendants were only entitled to charge the U.S. Air Force for direct labor costs that were incurred directly and exclusively in support of the Balad BBS project. Through their investigations and observations, Relators discovered that the Defendants improperly "cross charged" labor costs associated with other Michael Baker-affiliated entities and projects to their BBS Contract with the U.S. Air Force.

66.     In addition to the Balad project, Sallyport operated a secure compound in Baghdad's Mansour neighborhood that U.S. contractors operating in Iraq used to house their Baghdad-based employees.  For example, Sallyport entered into a fixed price contract with General Dynamics ("GD") to house GD employees at the Mansour facility.  Sallyport was also responsible for providing security for those employees when they left the compound.

67.     Although the Defendants' private contracts at Mansour were completely independent of the BBS Contract with the U.S. Air Force, some Sallyport employees worked on both the private and public contracts.  In order to improve their margin on the private contracts, the Defendants frequently cross charged the labor performed by these employees, meaning the work they performed on the Defendants' private Mansour contracts was improperly charged as though it was performed in support of the Balad BBS project.  Because the BBS Contract

24

operated as a cost-plus-award-fee agreement prior to definitization, the Defendants could shift these labor costs to the Balad BBS Contract without cutting into the profit they received from the U.S. Air Force. As a result of this cross charging, the government was repeatedly billed for labor that was completely unrelated to the Balad BBS project.

68. Moreover, Mr. Olson discovered that this cross-charging scheme extended to high-ranking managers at Balad. For example, Mr. Olson discovered that Deputy Program Manager Roland Tiso had engaged in cross charging. In addition to his position on the Balad BBS project, Mr. Tiso also held a senior position with Velox Visa & Passport Services ("Velox"), a company affiliated with Michael Baker. Even though Mr. Tiso spent much of his time on Velox-specific matters, the Defendants' billed the government as though Mr. Tiso worked on the Balad BBS project as a full-time employee. Mr. Olson reported his concerns regarding Mr. Tiso's conduct to Mr. Olson's supervisors, but no action was taken.

69. Separately, Mr. Cole and Ms. King also learned of the Defendants' cross charging through their investigation into the HRLN cell. Prior to their retaliatory discharge, described below, Mr. Cole and Ms. King uncovered several examples of local nationals improperly charging their work on the Defendants' private contracts in whole or in part to the BBS Contract.

**3. The Defendants mischaracterized the labor performed by their employees when billing the government under the BBS Contract.**

70. Timekeeping on the BBS Contract was organized using a Contract Line Item Number ("CLIN") system. Under this system, the various labor roles required by the PWS were assigned to one of four CLIN categories used at Balad and then to a sub-CLIN "payroll category" within that CLIN. In total, there were hundreds of payroll categories used on the

project. The Defendants' payroll system was responsible for matching an employee's labor to the CLIN and payroll category that most accurately reflected the work performed. This CLIN characterization determined how the Defendants billed the government for the direct cost of labor on the Balad project.

71. When an employee joined the Balad project, they were initially assigned to a CLIN that best reflected the work they were hired to perform. When an employee moved to a new position or took new responsibilities, the Defendants were supposed to document the transition and update the employee's assigned CLIN accordingly. The Defendants were also required to provide a justification for any work performed outside of an employee's assigned CLIN.

72. In practice, however, the Defendants frequently had employees perform work outside their assigned CLIN or sub-CLIN without informing the government. For example, if there was a labor shortage in a particular area, the Defendants would pull available employees to fill the shortage regardless of whether the work corresponded to the employees' assigned sub-CLINs. The Defendants' upper management made clear that such employees should nevertheless bill their work to their initially assigned sub-CLIN, even where it did not accurately reflect the work they had performed. Otherwise, the Defendants risked the government refusing to reimburse the employee's labor because it did not correspond with their assigned duties.

73. When employees attempted to bill their time to the appropriate sub-CLIN, they drew the ire of Project Manager Roy Hernandez. Mr. Hernandez would often call employees at Balad late in the evening to order them to "fix" their timesheets by changing their sub-CLIN to match their title as listed on the Defendants' daily Personnel Status Report ("PERSTAT"),

regardless of whether the new sub-CLIN accurately reflected the work they performed.  These daily PERSTATs often misrepresented an employee's actual function at the base.  For example, the PERSTAT continued to label Ms. King as a HAMS employee for over a year after her promotion to the Investigations Unit.

74.     Upon his arrival at Balad, Mr. Olson discovered that employees regularly worked outside of their assigned CLINs.  This practice resulted in substantial CLIN mischaracterization because corporate guidance at the time directed employees to bill only under the CLIN assigned to them during onboarding.  Mr. Olson raised this as a concern to his peers and managers during weekly meetings, and the response was simply, "This is how it is done."  In or around October 2016, corporate guidance changed to "correct" this issue by requiring employees to accurately bill the work they performed and then justify billings outside their assigned CLIN.  The Defendants, however, did not provide employees with any means of documenting their justifications.  As a result, at the conclusion of each monthly billing cycle, time charges would be routinely changed to an employee's assigned CLIN because supervisors did not have adequate explanations for charges outside that CLIN.  At the time of his termination, Mr. Olson was working to develop a justification form for work performed outside of an employee's assigned CLIN.  To his knowledge, the Defendants have still not implemented any such form.

**B.     The Defendants intentionally misappropriated FMS funds, often to provide bribes and kickbacks to Iraqi officials in violation of the FCPA.**

75.     As a Finance and Accounting Manager, Mr. Olson was responsible for ensuring that the Defendants' expenditures at Balad were appropriate under the Balad BBS Contract.

Shortly after arriving at the base in July 2016, he discovered numerous examples of the Defendants improperly diverting FMS funds and property from their lawful purpose to serve the Defendants' private business interests.  Often, these schemes were designed for the purpose of providing bribes and kickbacks to Iraqi officials in order to advance the Defendants' business in Iraq.  These expenditures, ultimately billed to the U.S. Air Force, were outside the scope of the BBS Contract's PWS and/or in violation the Defendants' clear contractual commitment to comply with Iraqi and American law, including the FCPA.

> **1.** **The Defendants paid unreasonable and unsupported payments to a subcontractor affiliated with Defendant Michael Baker International.**

76.     Given the large number of non-Iraqi employees working on the Balad BBS project, the Defendants had to process a significant number of visas and passports for its Balad workforce.  Initially, the Defendants subcontracted with Al Faq, an Iraqi-based company, to perform these services on a fee-per-visa basis. Eventually, the Defendants replaced Al Faq with Velox.  On its website, Velox is described as "a Michael Baker International Company."  Velox headquarters was located at Sallyport's Mansour complex.  Under the arrangement, Velox was responsible for managing the entire visa process.

77.     Velox was not licensed to conduct business in Iraq, which limited its ability to acquire cash.  As a result, several individuals on the Defendants' payroll were performing work to assist Velox.  Two women in the Balad BBS Human Resources Department worked fulltime to support visa and passport processing—work that was supposed to be performed by Velox as part of its comprehensive services.

78.     Velox also regularly overcharged the Defendants for its services.  Although Velox typically offered a rate of $1,250 per expedited visa, the Defendants paid Velox, on average, around $2,100 for expedited visas.  A large percentage of this cost reflected "expediting fees" for which Velox allegedly could not get receipts.  To justify its billing for these fees without documentation, Velox would routinely complete "missing receipt" forms stating they could not acquire a receipt for the fee.  Mr. Olson found that over a six-month period, the Defendants paid $1.2 million in expediting fees for all of their Iraqi contracts that were supported only by missing receipt forms.

79.     Mr. Olson objected to paying these exorbitant and undocumented fees.  Mr. Olson found it highly unusual that Velox could not obtain the receipts for these purported payments to the Government of Iraq and suspected that Velox was either pocketing this money or using it to bribe to Iraqi officials in violation of the FCPA.  When Mr. Olson explained his suspicions to his supervisors, they summarily rejected his concerns and dissuaded him from questioning the Defendants' dealings with Velox.  They warned Mr. Olson that the relationship between Velox and Michael Baker ownership was extremely sensitive in nature.

80.     In addition to the per-visa fee, Velox charged the Defendants a $3.8 million management fee.  When Mr. Olson informed his superiors that the Defendants should not be billing the government for profits earned by an affiliated company under applicable government regulations, *see* 48 C.F.R. § 31.205-26(e), they again dismissed his concerns.  As described below, Mr. Olson was ultimately terminated, in part, for raising concerns regarding Velox to his superiors.

29

**2.** **In violation of the FCPA, the Defendants provided Iraqi Air Force personnel, as well as other U.S. contractors, with goods and services outside the scope of the PWS in order to maintain their position as Balad's BBS provider.**

81.     At Balad, Mr. Olson also discovered numerous instances of "mission creep" where the Defendants had provided goods and services beyond the scope of the BBS Contract's PWS. The Defendants made these unnecessary expenditures to benefit the Iraqi Air Force officials and the U.S. contractors operating at Balad. In return, the Defendants hoped that these individuals would continue to support the Defendants' position as the BBS provider at Balad. These unnecessary expenses were then passed on to the U.S. government as though they were a necessary component of the Balad BBS project. None of these expenses were properly reimbursable under the BBS Contract and the payments to Iraqi Air Force officials also violated the FCPA.

82.     Shortly after deploying to the base, Mr. Olson noticed that the Defendants had provided Iraqi Air Force pilots and other personnel with both operational and personal automobiles. In total, he found the Iraqis had received about sixty vehicles from the Defendants, collectively worth approximately $3 million, including the cost of bringing those vehicles to Iraq. The Iraqis were allowed to take these vehicles off-base for their own personal use. In addition, the Iraqis were provided with unlimited free fuel for these vehicles. Mr. Olson heard that the Iraqis were refueling these vehicles up to four or five times each week, costing the Defendants up to $18,000 per week. The frequency of their refills led Mr. Olson to suspect that the Iraqis were reselling the fuel outside of the base.

83.     The BBS Contract PWS, however, did not call for the provision of any automobiles to the Iraqi Air Force, let alone unlimited fuel for such vehicles.  Rather, the PWS specifically required the Defendants to establish a system for on-base transportation within Balad's secure perimeter.  When Mr. Olson raised this issue both with the Program Management Office at Balad and the Financial Management Office in Reston, Mr. Saffold and Project Support Manager Paul Jakubowski asked him rhetorically whether he "wanted to keep the contract."

84.     Similarly, Mr. Olson discovered that the Defendants' mission creep extended to Lockheed Martin, the contractor responsible for maintaining the new Iraqi F-16 fleet.  The Defendants were providing Lockheed Martin with a service involving the fiber-based Internet to the Lockheed compound at Balad.  This service was valued at $250,000 per year, and the Information Technology Department at Balad told Mr. Olson this service was not required as part of their PWS obligations.  Mr. Olson reported this concern to his supervisors, but, once again, no action was taken to correct these overcharges to the government.

85.     As noted above, these "mission creep" expenditures operated as a kickback to those who could influence the DOD's decision on how to award the Balad BBS Contract.  If the Iraqi Air Force and U.S. contractors operating at Balad were dissatisfied with the Defendants' performance, DOD would be less likely to continue to award the BBS Contract to the Defendants.  The Defendants knowingly provided these unnecessary services, and subsequently billed them to the government, in order to solidify their relationships with these key players.  As payments made to foreign government officials in order to influence their decision making, the cars and fuel provided to the Iraqi Air Force personnel were in violation of the FCPA.  Therefore the Defendants improperly charged the government for payments that were unlawful and not

reimbursable under the BBS Contract, and also breached their contractual commitment to comply with U.S. law.

> ### 3. The Defendants utilized an uncompetitive, non-Iraqi procurement company in violation of Iraqi and American law.

86.     The Defendants required a procurement subcontractor to assist with the large number of procurements necessary for the BBS project.  The Defendants hired Theodor Wille Intertrade ("TWI"), a Dubai-based, sole-source logistics company, to perform this work.  For significant procurements, TWI was required to solicit at least three competitive bids and maintain adequate documentation of this bidding process.  However, Mr. Olson believed that TWI was not engaging in a competitive bidding process for items it procured for the Defendants, resulting in excessive costs that were passed through to the government.  These procurements made up a significant portion of the Defendants' expenses, totaling up to $15 million per month.

87.     For example, in one instance, Mr. Olson observed a TWI freight bill of approximately $40,000 for a single container of goods.  Mr. Olson knew that the cost of shipping such a container was typically closer to $1,200.  Moreover, the freight costs associated with other containers in this shipment had all been below $5,000.  Concerned by what appeared to be a drastic overcharge, Mr. Olson asked Thomas Smith, the Logistics Manager at Balad, why the bill was so high.  Mr. Smith indicated that it was due to a tariff.  When Mr. Olson asked what could cause such a significant tariff, Mr. Smith did not know and could not provide Mr. Olson with an answer.  Mr. Olson could never get a satisfactory explanation for this exorbitant cost.

88.     In addition, TWI ran afoul of the "Iraq First" requirement prescribed by Iraqi law. Under this directive, contractors are required to hire Iraqi companies or provide an adequate

justification for going outside the country. TWI regularly ignored this policy and would not

procure readily available items from Iraqi sources. TWI's resistance to Iraqi sourcing not only

violated the Iraq First policy but also produced higher costs. For example, TWI procured the

food for the Balad BBS project from outside Iraq and then had it shipped into the country on

refrigerated trucks. TWI could have procured Balad's food locally, from Iraqis, at a much lower

cost.

89.     On various occasions, Mr. Olson raised concerns about TWI's procurement costs

to Mr. Rice, Mr. Smith, Mr. Saffold, Mr. Jakubowski, and Mr. Perkins. Invariably, he was

strongly advised to drop his inquiry because TWI was "connected." In addition, despite repeated

requests, he was never allowed to see any documentation regarding TWI's competitive bidding

procedures. As a result, he was effectively stonewalled in his attempts to determine the extent to

which the Defendants—and through them, the government—were overpaying for the goods and

services procured by TWI.

### 4.     The Defendants failed to monitor subcontractor performance and knowingly billed the government for overpayments made to subcontractors.

90.     In or around October 2016, Mr. Olson also discovered that the Defendants had no

mechanism for ensuring that goods and services provided by subcontractors met contractual

standards, and subsequently learned that the Defendants willfully ignored plain evidence that

payments were made for goods and services never provided. Mr. Olson was particularly

concerned about the Defendants' contract with an Iraqi company named Dijla that was hired to

maintain the portable restrooms at Balad. Mr. Olson found that no one on the base was signing

off for the services received from Dijla and that there was no record that the services had been adequately performed. Moreover, one of Dijla's obligations under their subcontract was to provide thousands of gallons of liquids to service the portable restrooms. Dijla had submitted suspiciously identical invoices to the Defendants, indicating that they had provided precisely the same amount of liquids to the Defendants every month. The invoices consistently reflected that Dijla had delivered the exact amount of liquid, to the gallon, called for in the subcontract.

91.     Mr. Olson immediately flagged this concern to Mr. Jakubowski and the corporate-level Program Control Manager Specialist, Candy McLarin. In response, he was told that because the subcontract was a "firm-fixed-price" agreement, the subcontractor would be fully paid even if it failed to meet its contractual obligations. Mr. Olson explained to them that this was an incorrect understanding of how such contracts operated and that adequate performance was still required of the subcontractors. He also informed his supervisors, including Mr. Saffold, Mr. Jakubowski, Ms. McLaren, Mr. Perkins, and Chief Financial Officer Mike Altshuler, that the DCAA would not accept the suspicious invoices if it realized that they included the exact same figures every month. To address his concerns, he requested that the Defendants hire a full-time contract administrator at Balad to directly oversee subcontractor performance. This recommendation was not implemented.

92.     Similarly, in or around January 2017, Mr. Olson encountered another instance of subcontractor mismanagement and waste, this time relating to the base's fuel supply. Electricity at Balad was provided entirely by generators. To maintain the flow of electricity, the base required up to 25,000 gallons of diesel fuel each day. In prior years, this fuel was provided by Al Faq, the same Iraqi company that had assisted the Defendants with visa and passport services.

34

93.     When the relationship between Sallyport's Chief Operating Officer and Al Faq management soured in January 2017, Sallyport decided to switch fuel vendors for the Balad project to ICCS, Inc., an American company, and paid ICCS cash in advance for a shipment of 165,000 liters of fuel.  Nevertheless, even after signing the new contract, Balad received a shipment of fuel from Al Faq trucks with Al Faq drivers, just as it had in the months prior.  Al Faq billed the Defendants for the delivery, and the Defendants paid Al Faq for the fuel in the ordinary course.  ICCS also submitted an invoice related to the same delivery of fuel, directly overlapping with the payments made to Al Faq.

94.     When Mr. Olson asked why ICCS was entitled to payment for a delivery made by Al Faq drivers in Al Faq trucks, ICCS claimed that the Al Faq drivers had in fact delivered ICCS fuel and simply failed to identify themselves as agents of ICCS rather than Al Faq.  Unsatisfied by this explanation, Mr. Olson refused to approve ICCS's payment request.  Moreover, he reported his concerns to Mr. Saffold and requested that Mr. Saffold reject ICCS's request.  Mr. Saffold ignored Mr. Olson's warnings and approved the payment.  As a result, the Defendants knowingly billed the government twice for the same service, resulting in at least $100,000 in unnecessary expenditures by the government.  As with the Dijla subcontract, the Defendants' senior employees were aware of Mr. Olson's concerns but failed to take any steps to ensure that government funds were not being wasted.

C.     **The Defendants retaliated against Relators for investigating and reporting their fraudulent activities.**

95.     Despite Relators' repeated attempts to alert their supervisors to the fraudulent activities described above, the Defendants never took action to address the endemic waste and

35

abuse of government funds taking place at Balad.  To the contrary, when presented with evidence of wrongdoing, the Defendants' senior employees curtailed Relators' investigations and subsequently retaliated against them.

96.     In November 2016, Mr. McCloud, the government's primary contract representative at Balad, began to discover the extent to which the Defendants were interfering with the Investigations Unit's work.  On November 23, 2016, Mr. McCloud met with Mr. Cole for a routine audit of the Investigations Unit.  As part of this process, Mr. McCloud requested copies of their Case File Tracker and Standard Operating Procedures.  Mr. Cole discussed this request with Mr. Saffold and then sent the documents to Mr. McCloud.

97.     The following day, Mr. McCloud sent an email to Mr. Saffold regarding these documents and the Investigations Unit more generally.  In particular, he was concerned that the Investigations Case Tracker indicated that certain investigations were taken over or shut down by the Project Manager or Security Manager.  The email then emphasized  the importance of an independent Investigations Unit:

> The intent of the PWS for this section is to ensure every investigation is fair, consistent and free from conflict of interest, bias, prejudice, or self-interest. Investigations should be free from improper influence, interference or any other action that hinders an investigation.

Mr. McCloud then instructed Mr. Saffold to answer a number of questions regarding oversight of the Investigations Unit's work, including who had authority to terminate or reassign an investigation and whether a "chain of custody document" was created when an investigation was

turned over, taken over, or shut down.  The email also specifically inquired as to whether the government had been reimbursed for timesheet frauds uncovered by the Investigations Unit.

98.     Upon receiving this email, Mr. Saffold immediately called Mr. Cole.  Mr. Saffold was furious and accused Mr. Cole of supplying Mr. McCloud with the questions posed in the email.  Mr. Cole stated that he had nothing to do with the questions and that he felt Mr. Saffold was harassing him simply for being truthful with Mr. McCloud.  Nevertheless, Mr. Saffold continued to accuse Mr. Cole of collaborating with Mr. McCloud in an aggressive and abusive manner, until Mr. Saffold abruptly hung up.  Mr. Cole later learned that, ten minutes after this conversation, Mr. Saffold had requested Mr. Cole's start date from the Human Resources Department.

99.     Mr. Saffold's retaliatory actions were an attempt to deter Mr. Cole—and the rest of the Investigations Unit—from being truthful and forthcoming during government audits.  Mr. Cole filed a complaint with Sallyport's Ethics Compliance Officer, Shauna Alonge, regarding Mr. Saffold's conduct but never received any response.

100.     Subsequently, Mr. McCloud requested copies of three Investigations Unit case files, including the files on both the PAX Terminal smuggling and prostitution investigation and the ATOC-Cargo timesheet investigation.  Mr. Saffold instructed Mr. Cole and Ms. King to withhold these files so that he could escalate the matter to his supervisors in Reston.  Mr. Saffold also instructed Mr. Cole and Ms. King to avoid Mr. McCloud around the base.  Eventually, the Defendants turned over the case files to Mr. McCloud.

101.     Mr. McCloud grew concerned that the Defendants would continue to retaliate against Mr. Cole and Ms. King for their investigations.  To document his concerns, Mr. McCloud

drafted an email to his supervisors at Wright-Patterson Air Force Base regarding the Defendants' conduct towards Mr. Cole and Ms. King and his fear that they would be subject to additional retaliation. He also informed Mr. Cole and Ms. King that he would attempt to have the PWS amended to explicitly prohibit retaliation against them.

102. Around the same time, the Defendants were becoming increasingly hostile towards Mr. Olson due to his repeated attempts to address the fraudulent and suspicious activities he had discovered at Balad. The Defendants' frustration with Mr. Olson came to a head when he returned to the United States to spend the holidays with his family in late 2016. On January 5, 2017, Mr. Olson received a letter notifying him of his termination. The Defendants provided no explanation for why he was terminated.

103. As Mr. Cole and Ms. King progressed in their investigation into the HRLN cell at Balad in January 2017, the Defendants became increasingly hostile towards their work. In early February 2017, the Defendants, for the first time, instructed Mr. Cole and Ms. King to report directly to Sallyport's in-house and outside counsel.

104. Approximately one month later, on March 12, 2017, the Defendants abruptly terminated Mr. Cole and Ms. King. On that day, they were surrounded by armed guards, disarmed, detained, and told that they were being terminated at the direction of Sallyport's corporate office in Reston. Mr. Cole and Ms. King were then escorted back to their living quarters, where they both immediately filed whistleblower complaints with the DOD Office of the Inspector General.

105.    The next day, Mr. Cole and Ms. King were flown back to the United States. When they arrived, Mr. Cole and Ms. King filed an additional whistleblower complaint with the U.S. Air Force Office of Special Investigations.

## COUNT ONE

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)-(B), (a)(1)(G)

106.    Relators allege and incorporate by reference the allegations made in Paragraphs 1 through 105 of this Complaint.

107.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

108.    By virtue of the acts described above, the Defendants knowingly submitted or caused to be submitted to the United States Government false or fraudulent claims for payment of labor, services, and materials under the Balad BBS Contract that did not qualify for payment. Each of these requests for payment constitutes an actionable false claim under the False Claims Act.

109.    Through the acts described above and otherwise, the Defendants, and their agents and employees, knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.

110.    Through the acts described above and otherwise, the Defendants, and their agents and employees, knowingly made, used, and/or caused to be made or used false records and statements material to an obligation to pay or transmit money or property to the United States

Government, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States Government.

111.    The United States, unaware of the falsity of the records, statements or claims made by the Defendants, paid the Defendants for claims that would otherwise not have been allowed.

112.    By reason of these payments, the United States Government has been damaged, and continues to be damaged, in the amount of millions of dollars.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

1.  That the Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.  That the Court enter judgment against the Defendants in an amount equal to three times amount of damages the United States has sustained as a result of the Defendants' actions, as well as civil penalties against the Defendants of $21,916 for each violation of 31 U.S.C. § 3729 *et seq.*;

3.  That Relators be awarded all costs and expenses of this action, including attorney's fees; and

4.  That the United States and Relators receive all such other relief as the court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demands

trial by jury.

Respectfully submitted,

Chris McLamb

Eric R. Havian

Mary A. Inman

Constantine Cannon LLP

150 California St, Ste 1600

San Francisco, CA 94111

Telephone: (415) 639-4001

Fax: (415) 639-4002

cmclamb@constantinecannon.com

ehavian@constantinecannon.com

minman@constantinecannon.com

Frederick M. Morgan, Jr. (0027687)

Trial Attorney

Jennifer M. Verkamp (0067198)

MORGAN VERKAMP, LLC

35 E 7th Street, Suite 600

Cincinnati, Ohio 45202-2015

Tel: (513) 651-4400

Fax: (614) 651-4405

rick.morgan@morganverkamp.com

jverkamp@morganverkamp.com

*Counsel for Relator*